UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPHEYR, INC.,

                          Plaintiff,

          – against –

BROOKLYN MINDS PSYCHIATRY
P.C.,

                          Defendant.

<u>**OPINION & ORDER**</u>

22-cv-08427 (ER)

RAMOS, D.J.:

Spheyr, Inc., brought this action against Brooklyn Minds Psychiatry P.C. for recovery on a promissory note.  Spheyr now moves to enforce a purported settlement agreement made during the course of this litigation.  Doc. 51.  For the reasons set forth below, Spheyr's motion is GRANTED.

I.      BACKGROUND

A.  **The Underlying Action**

The underlying facts of this case are set out in a previous opinion deferring Spheyr's motion for summary judgment.  *Spheyr, Inc. v. Brooklyn Minds Psychiatry P.C.*, No. 22 Civ. 8427 (ER), 2023 WL 5530363, at *1–4 (S.D.N.Y. Aug. 28, 2023); *see* Doc. 26.  The Court provides an abbreviated summary of the relevant details here.

Spheyr is a concierge medical service founded by Dr. Owen Muir and David Balinski.  *Spheyr*, 2023 WL 5530363, at *1.  Brooklyn is a medical psychiatry practice that is currently owned by Dr. Amanda Itzkoff.  *Id.*  At the time that the promissory note was executed, however, Brooklyn was co-owned by Muir and his wife, Dr. Carlene MacMillan.  *Id.*  Spheyr engaged Brooklyn to provide psychiatric services to employees of Spheyr's clients in several states.  *Id.*

Brooklyn executed the promissory note at issue on September 28, 2021.  *Id.*  As of that date, according to the note, Spheyr had loaned Brooklyn $451,000.  *Id.*  On April 8,

2022, Muir and MacMillan sold Brooklyn to Itzkoff.  *Id.* at *3.  This change of control triggered a default on the promissory note.  *Id.*  On August 11, 2022, Spheyr demanded payment from Brooklyn of $461,756.96.  *Id.*  Brooklyn did not make any payment on the note.  *Id.*

Spheyr filed this action on October 3, 2022, seeking to collect the amounts due under the promissory note.  Doc. 1.  On January 20, 2023, Spheyr moved for summary judgment.  Doc. 16.  On August 28, 2023, the Court issued an opinion deferring consideration of the motion until the completion of discovery.  *Spheyr*, 2023 WL 5530363, at *6.  A discovery plan and scheduling order was entered on September 1, 2023.  Doc. 28.

### B.  The Purported Settlement Agreement

According to Spheyr, the parties engaged in settlement discussions beginning in September 2023.  Doc. 52 ¶ 7.  On September 27, 2023, David Tobias (Spheyr's counsel) and Shane Heskin (Brooklyn's counsel) had a phone conference in which they discussed settlement.  *Id.*  During that conference, counsel for Spheyr and Brooklyn discussed the possibility of settling for $170,000—a "split the baby" amount halfway between Spheyr's latest demand of $240,000 and Brooklyn's offer of $100,000.  *Id.*  The parties also discussed whether the settlement amount would be paid in a lump sum or over time.  *Id.*  Counsel for Brooklyn said his client—Jack Wolcowitz, who controlled Brooklyn—was thinking of $150,000 or $175,000 to settle, with some money up front and the rest over six months.  *Id.*

At the end of the conversation, Abe Neuhaus (Brooklyn's corporate counsel) "injected himself into the discussion."  *Id.* ¶ 8.  Specifically, corporate counsel "started talking about suing the Muirs for rescission and paying Mr. Heskin $175,000.00 to fight and not settle."  *Id.*  Corporate counsel then described a potential transaction involving "an unnamed third party purchasing Spheyr's notes to resolve Spheyr's claims."  *Id.*  Spheyr's counsel asserts that this transaction "made no sense to me in the context of this

lawsuit." *Id.* Spheyr left the conversation expecting to hear from Brooklyn about the settlement the parties had been discussing for the past month, with a specific settlement amount and time period for payment. *Id.*[1]

On October 17, 2023, after no further discussions regarding settlement had occurred, counsel for Spheyr and Brooklyn had another telephone call. *Id.* ¶ 9. Brooklyn told Spheyr that Wolcowitz's father had recently had a heart attack and that Brooklyn's corporate counsel was hoping to speak with Wolcowitz that day. *Id.* Counsel for Brooklyn also said he would call Spheyr about the settlement once he heard from corporate counsel. *Id.*

Two days later, on October 19, Brooklyn emailed Spheyr the following message: "Client can do $150k paid within 10 days. I would jump on this before he changes his mind." Doc. 55-1 at 5. One minute later, Brooklyn sent another email that said: "FYI. They are filing a rescission complaint against seller so they really have no incentive to pay any of these debts." Doc. 52 ¶ 11.

After discussion with his client, Spheyr's counsel emailed back the next morning: "Sph[eyr] will accept the offer. Please provide me the settlement papers you propose as soon as possible so the settlement amount paid can be paid promptly." *Id.* ¶ 12 (emphasis omitted); Doc. 55-1 at 4. Brooklyn responded six minutes later: "Thanks David. I will pass this along but Jack's father passed away yesterday so I might have trouble getting in touch with him to finalize but will do my best." Doc. 55-1 at 3–4. Spheyr replied: "Thanks, Shane. Sorry to hear of Jack's loss. Please keep me apprised of your progress." *Id.* at 3. Spheyr asserts that these October 19–20 emails—with Brooklyn offering to pay $150,000 within ten days and Spheyr responding that it would accept the offer— constitute an enforceable settlement agreement.

---

[1] Brooklyn's counsel has submitted his own declaration, Doc. 55, but he does not dispute Spheyr's account of the September 27 conference. His declaration adds only that corporate counsel's description of the third-party transaction was "the final proposal made to [Spheyr]" during the conference. *Id.* ¶ 5.

Later that same afternoon, Brooklyn wrote to Spheyr again, stating:

> Thanks David.  I am copying Abe [Brooklyn's corporate counsel] on this so he can work out the details of the settlement transaction.  As we discussed at our last meeting, we are structuring it as a purchase of your client's rights and a third party will be paying the $150k in 30 days.  It will not be coming from my client.  Either way, your client is getting $150k.  It's just a matter of how we paper it up.
>
> Abe, do you want to take a crack at papering this up or do you want us to do it?

*Id.* at 2–3.  Brooklyn's corporate counsel responded:

> Because [J]ack's father died today and he will be sitting shiva probably until next Friday I will not know who the purchaser is, and the papers etc will be up to the purchaser, not my client.  Timing is thus impacted.
>
> I know that whoever the purchaser is, they will expect cooperating (testifying and documents etc) and assignment of the judgment, all rights and interest in and to the notes and the NY and federal litigations.  Also, to be clear, this is not a settlement between us, we are not paying anything, but rather, this is a transaction between [Spheyr] and the purchaser.  Thus, the purchaser will have to direct traffic on this matter.  If the seller wants to start preparing these papers, that will probably help expedite the transaction but I have no way of helping move this transaction forward until I know who the purchaser is.
>
> I hope this clarifies matters.

*Id.* at 2.  Spheyr's counsel then told corporate counsel that Spheyr was upset by this attempt to change the terms of the settlement agreement, which Spheyr had already accepted.  *Id.* at 1.  Spheyr's counsel stated:

> My client is very upset that I had an accepted offer with [Brooklyn's counsel] for $150,000.00 to be paid in ten days, and that you are attempting to change those terms.  To the extent your client wishes to change the terms, my client is prepared to accept $150,000.00 to be paid on or before October 31, 2023, 10% of any recovery for my client's assistance in collection, and that a draft of proposed settlement be received by me on or before October 25, 2023.  Please understand that my client presently has asserted and filed claims for $850,000.00, interest and legal fees, so this settlement [is] a tremendous bargain for your client.

*Id.*  Brooklyn's corporate counsel responded:

4

> My client never extended any offer.  I had told you on the phone last
> we spoke that we would get you someone to purchase the note and
> relevant interests, you were on notice exactly what was meant.
> [Brooklyn's counsel] was not authorized to make an offer on behalf
> of the client to actually pay you 150k and that was never intended.
>
> You can do whatever you want and continue to litigate if you like,
> or as soon as my client gets up from shiva or I learn the identity of
> the purchaser I can help arrange that purchase and assignment, if
> you are not satisfied with that, then there will be no deal.

*Id.*

In the months after this email exchange, counsel for Spheyr and Brooklyn went back and forth on terms of the sale agreement with the third-party purchaser.  Doc. 52 ¶¶ 16–31.  Spheyr's counsel asserts that he made a two-month effort to pursue the sale agreement but that Brooklyn and the purchaser "dragged their feet" and ultimately abandoned the sale.  *Id.* ¶ 31.  Brooklyn's counsel, for his part, says Spheyr is to blame because it changed the terms of the agreement with the third-party purchaser.  Doc. 55 ¶¶ 17–21.  And Brooklyn claims that Spheyr used the settlement discussions as a basis to delay discovery.  *Id.* ¶ 22.

On January 31, 2024, Spheyr moved to enforce a settlement agreement in the amount of $150,000 based on the October 19–20 email exchange.  Doc. 51.

## II.   LEGAL STANDARD

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it."  *BCM Dev., LLC v. Oprandy*, 490 F. App'x 409, 409 (2d Cir. 2013) (citation omitted).  The party seeking to enforce the agreement bears the burden of proving that an enforceable and binding agreement exists.  *Grgurev v. Licul*, No. 15 Civ. 9805 (GHW), 2016 WL 6652741, at *3 (S.D.N.Y. Nov. 10, 2016).  Settlement agreements are contracts and therefore are analyzed under principles of contract law.  *Murphy v. Inst. of Int'l Educ.,* 32 F.4th 146, 150 (2d Cir. 2022).  When a party enters into a settlement agreement through a "deliberate, strategic choice," that party's "subsequent change of heart will not unmake a bargain already made."  *HVN*

*Clothing, Inc. v. Lomeway E-Commerce (Luxembourg) Ltd.*, 636 F. Supp. 3d 451, 455 (S.D.N.Y. 2022) (citations omitted).  "[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event."  *Id.* at 456 (alteration in original) (citation omitted).  "A presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements."  *Green v. N.Y.C. Transit Auth.*, No. 15 Civ. 08204 (ALC) (SN), 2022 WL 2819738, at *2 (S.D.N.Y. May 10, 2022), *report and recommendation adopted*, 2022 WL 2819578 (S.D.N.Y. July 19, 2022).[2]

A settlement agreement requires mutual assent of the parties, which can be evidenced in various forms and is not solely limited to a fully executed contract.  *Id.* Courts may recognize settlement agreements that are oral or written in an email, even where the parties discuss a subsequent memorialization in an executed document.  *Id.* Courts do not attempt to determine the "secret or subjective intent of the parties"; rather, "it is the objective intent . . . that controls."  *Id.* (omission in original) (internal quotation marks and citation omitted).

The Second Circuit recognizes two kinds of preliminary agreements, both of which are enforceable, "but in different ways, and subject to different damages in the event of a breach."  *Chang v. CK Tours, Inc.*, 605 F. Supp. 3d 529, 537–38 (S.D.N.Y. 2022).  "A 'Type I' agreement 'occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation."  *Id.* at 537 (quoting *Murphy*, 32 F.4th at 150).  A Type I agreement "is preliminary only in the sense that the parties desire a more elaborate formalization of the agreement, which,

---

[2] The parties do not address whether the Court should apply New York law or federal common law here. The Court need not resolve the question, however, because "[t]he principles of New York law and federal common law regarding the enforceability of settlement agreements are materially indistinguishable, such that the Court may apply the two sets of laws interchangeably."  *Grgurev*, 2016 WL 6652741, at *3 n.1 (internal quotation marks and citation omitted); *see also, e.g.*, *Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.*, No. 06 Civ. 2652 (JGK), 2008 WL 5169495, at *2 n.1 (S.D.N.Y. Dec. 9, 2008) ("[T]here is no material difference between New York law and federal common law, with respect to the standards for contract formation.").

although not necessary, is desirable." *Id.* (quoting *Murphy*, 32 F.4th at 150). "Type II preliminary agreements do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Id.* at 537–38 (quoting *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 441 (S.D.N.Y. 2021)). The question here is whether the parties reached a Type I agreement.

Courts rely on a four-factor test, which comes from *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985), to analyze the enforceability of a Type I settlement agreement. *See Chang*, 605 F. Supp. 3d at 538. This analysis is used in determining whether the parties "intended to be bound by a settlement agreement in the absence of a document executed by both sides." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997). The four factors from *Winston* are: "(1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.* (citing *Winston*, 777 F.2d at 80). These factors guide the court, but "[n]o single factor is decisive," and the determination of whether a contract was formed ultimately rests on the intent of the parties—that is, "whether the parties intended to be bound, and if so, to what extent." *Chang*, 605 F. Supp. 3d at 538 (citations omitted). The relevant circumstances of contract formation "may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." *Winston*, 777 F.2d at 81 (internal quotation marks and citation omitted).[3]

---

[3] Brooklyn appears to suggest that the *Winston* factors do not apply here because they govern "oral settlements." Doc. 54 at 13. But courts regularly use the *Winston* test to determine "whether . . . parties intended to be bound to an oral or unsigned settlement agreement." *Xie v. Caruso, Spillane, Leighton, Contrastano, Savino & Mollar, P.C.*, 632 F. Supp. 3d 262, 267 (S.D.N.Y. 2022) (omission in original) (citation omitted); *see also, e.g., Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621

## III.    DISCUSSION

The Court's analysis is guided by the four *Winston* factors set forth above.  *See, e.g.*, *Chang*, 605 F. Supp. 3d at 538.  As explained below, both parties demonstrated an intent to be bound by the settlement agreement discussed in the October 19–20 email exchange.  Thus, the Court finds that the agreement should be enforced.

### A.   Express Reservation Not to Be Bound

The first *Winston* factor is "whether there has been an express reservation of the right not to be bound in the absence of a writing."  *Winston*, 777 F.2d at 80.  This factor is "frequently the most important."  *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).  While this factor "is phrased in terms of 'express' reservations," courts also analyze "whether the particular facts and circumstances of the case—such as the nature of the negotiations or the language of any draft agreements—demonstrate an implied reservation of the right not to be bound until the execution of a written agreement." *Lindner v. Am. Express Corp.*, No. 06 Civ. 3834 (JGK), 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007).  But "the mere fact that the parties contemplate a later writing is insufficient to establish an intent not to be bound until that time."  *Id.*

Spheyr contends that neither party demonstrated any intent to be bound only by a signed writing.  Doc. 53 at 7.  Spheyr's counsel asserts that although he referred to "settlement papers" in his acceptance, "absolutely no reservation of rights was made, nor were the settlement terms ever made conditional upon another signed writing."  Doc. 52 ¶ 33 n.2; *accord* Doc. 53 at 7 n.2.  According to Spheyr, "the settlement agreement was to resolve all of Spheyr's claims, and any further papers were not crucial."  Doc. 52 ¶ 33 n.2.

Brooklyn, on the other hand, argues that the evidence demonstrates the parties' intent to be bound to any settlement only upon "a to-be-negotiated papered agreement."

(KMW) (AJP), 2005 WL 1377853, at *6 n.5 (S.D.N.Y. June 9, 2005) ("[T]he *Winston* analysis has been utilized in this Circuit when an agreement is written but not executed into a formal document by both parties.").

Doc. 54 at 8.  In particular, Brooklyn points to counsel for Spheyr's email accepting the offer, in which he stated:  "Please provide me the settlement papers you propose as soon as possible so the settlement amount paid can be paid promptly."  Doc. 55-1 at 4. According to Brooklyn, this reference to "settlement papers" means that Spheyr conditioned the settlement on an agreement being memorialized in writing.  Doc. 54 at 8; *see also id.* at 13 (arguing that Spheyr "condition[ed] its acceptance on [Brooklyn] providing a written settlement agreement").

The Court finds that Spheyr's request for "settlement papers" does not demonstrate an intent to be bound only upon completion of a signed writing.  Courts have recognized that even where parties contemplate a written agreement, "that fact does not preclude a finding of an earlier binding agreement."  *Emile v. Ethical Culture Fieldston School*, No. 21 Civ. 3799 (JPO), 2023 WL 4763233, at *2 (S.D.N.Y. July 26, 2023). Here, the fact that Spheyr's counsel asked Brooklyn to provide him with settlement papers does not compel the conclusion that the parties intended to be bound *only* upon the signing of those papers.  *See, e.g.*, *Jackson v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 9193 (DLC), 2012 WL 1986593, at *3 (S.D.N.Y. June 4, 2012) ("Discussing execution of a formal document . . . is not the same as reserving the right not to be bound in the absence [of] a formal document."); *see also Shape CD, Ltd. v. Quiksilver, Inc.*, No. 07 Civ. 2033 (PKC), 2008 WL 2009668, at *2 (S.D.N.Y. May 6, 2008) ("The absence of a fully executed settlement agreement need not be fatal to enforcement, even if one were originally contemplated by the parties.").  Brooklyn's email to Spheyr also did not demonstrate any reservation on Brooklyn's part of the right not to be bound.  On the contrary, Brooklyn's counsel encouraged Spheyr to "jump on this" before the client changed his mind.  Doc. 55-1 at 5.

Accordingly, the Court cannot agree with Brooklyn's assertion that the parties intended to be bound only upon negotiation of a "papered agreement." Doc. 54 at 8. The first *Winston* factor weighs in favor of enforcement of the parties' settlement agreement.[4]

### B.  Partial Performance

The second *Winston* factor is "whether there has been partial performance of the contract." *Winston*, 777 F. 2d at 80. Spheyr concedes that there has been no partial performance in this case, Doc. 53 at 7, so this factor weighs against enforceability, *see, e.g.*, *In re Lehman Bros. Holdings Inc.*, No. 17 Civ. 03424 (DLC), 2017 WL 3278933, at *3 (S.D.N.Y. Aug. 2, 2017). The second factor, however, has "the least sway with the court." *Xie v. Caruso, Spillane, Leighton, Contrastano, Savino & Mollar, P.C.*, 632 F. Supp. 3d 262, 268 (S.D.N.Y. 2022) (citation omitted).

### C.  Existence of Open Terms

The third *Winston* factor is "whether all of the terms of the alleged contract have been agreed upon." *Winston*, 777 F.2d at 80. "The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987). The Second Circuit has said that "[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (quoting *Tribune*, 670 F. Supp. at 499). Still, "the parties' intent is ultimately controlling: if the parties intended to be bound despite the presence of open terms, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations, provided that

---

[4] Brooklyn also notes that after the October 19–20 email exchange, Spheyr sent proposed settlement papers to the third-party purchaser. Doc. 54 at 8. But Spheyr made clear during those subsequent negotiations that it was not abandoning its right to enforce the initial agreement. *See* Doc. 38 at 1 (stating that Spheyr would engage in negotiations "while reserving its rights in connection with the settlement agreement to which the parties had previously agreed on October 20, 2023, and to which its pending request concerning a motion to enforce relates").

the agreement is not so fragmentary as to be incapable of sustaining binding legal obligation." *Vacold LLC v. Cerami*, 545 F.3d 114, 128 (2d Cir. 2008) (internal quotation marks and citations omitted).

Spheyr argues that the parties agreed to "simple settlement terms": the settlement amount and the time of payment. Doc. 53 at 7. And Spheyr contends that the agreement—formed by Brooklyn's offer and Spheyr's acceptance—"resolved all claims between the parties, without reservation." *Id.* at 7 n.2.

Brooklyn responds that not all terms were agreed upon. Doc. 54 at 13. According to Brooklyn, no terms other than the dollar amount had been discussed in detail, and the identity of the third-party purchaser was unknown on October 20. *Id.* Brooklyn thus asserts that Spheyr is trying to enforce an "uncontemplated and unfinalized settlement agreement." *Id.* at 9.

The Court finds that there were no material open terms in the October 19–20 agreement. The only specific open term that Brooklyn points to is the identification of a third-party purchaser. But the evidence before the Court indicates that this was not a material term because it was not mentioned in Brooklyn's offer at all.

The context in which Brooklyn's offer was made supports that conclusion. During their September 27 conversation, counsel for Spheyr and Brooklyn discussed the settlement amount—specifically, the possibility of a compromise figure of $170,000. Doc. 52 ¶ 7. They also talked about whether the settlement would be paid in a lump sum or over time. *Id.* Brooklyn's counsel said his client was thinking about $150,000 or $175,000, with some money to be paid up front and the rest over a period of six months. *Id.* At the end of the meeting, according to Spheyr, Brooklyn's corporate counsel "injected himself into the discussion." *Id.* ¶ 8. Brooklyn's corporate counsel described a potential transaction involving an unnamed third party purchasing Spheyr's notes to resolve Spheyr's claims. *Id.* Spheyr's counsel asserts that this transaction "made no sense to me in the context of this lawsuit." *Id.* When he left the meeting, therefore,

Spheyr's counsel expected to hear from Brooklyn's counsel about the settlement they had been discussing for the past month.  *Id.*

Following that conversation, Brooklyn's counsel emailed Spheyr's counsel on October 19:  "Client can do $150k paid within ten days.  I would jump on this before he changes his mind."  Doc. 55-1 at 5.  Nothing in this message indicates that the offer had anything to do with the third-party transaction mentioned by Brooklyn's corporate counsel.  The most reasonable interpretation of counsel for Brooklyn's language is that the offer was coming from his client—who was explicitly mentioned in the email—rather than from a third party.  Furthermore, Brooklyn's email filled the gaps that remained after the September 27 conversation by identifying the settlement amount and the timeframe in which it would be paid.  In short, nothing in Brooklyn's email offering to resolve the case for $150,000 within ten days suggests that the identification of a third-party purchaser was an open term that still needed to be resolved.  *Cf. Geneva Laboratories Ltd. v. Nike W. Afr. Imp. & Exp. Inc.*, No. 19 Civ. 4419 (EK) (RER), 2021 WL 7287611, at *7 (E.D.N.Y. Aug. 16, 2021) ("If the parties have agreed to the settlement amount, courts often find that this factor favors enforcement even when the parties are still negotiating additional terms."), *report and recommendation adopted*, 2022 WL 673257 (E.D.N.Y. Mar. 7, 2022); *Scheinmann v. Dykstra*, No. 16 Civ. 5446 (AJP), 2017 WL 1422972, at *3 (S.D.N.Y. Apr. 21, 2017) (enforcing settlement agreement where the parties' emails "contained the agreement's material terms—indeed, its only terms").

The Court concludes that the October 19–20 agreement did not contain any open material terms relevant to the execution of a binding settlement agreement.  The third *Winston* factor thus weighs in favor of enforceability.

### D.  Type of Agreement Usually Committed to Writing

The fourth *Winston* factor is "whether the agreement at issue is the type of contract that is usually committed to writing."  *Winston*, 777 F.2d at 80.  This factor

typically is concerned with "the complexity of the agreement, and whether that complexity suggests the need for a writing." *Chang*, 605 F. Supp. 3d at 541–42.

Spheyr states that the email exchange including an offer and acceptance with "simple, straightforward terms of settlement" was sufficient.  Doc. 53 at 8.  Brooklyn responds that "a purchase of notes and assignments of rights is exactly the type of contract that must be in writing, particularly here where the contemplated contract was between Spheyr and a third-party, not Spheyr and Brooklyn."  Doc. 54 at 14.

The Court finds that the October 19–20 settlement agreement is straightforward and does not meet the level of complexity that requires a more formalized writing.  The Second Circuit concluded in *Ciaramella* that a formal writing was required where the settlement agreement was eleven pages long and included terms that would apply in perpetuity.  *See* 131 F.3d at 326.  Additionally, in *Winston*, the Second Circuit determined that a four-page agreement for $62,500, with payment "to be made over several years based on a percentage of earnings," was sufficiently complex to require a formalized writing.  *See* 777 F.2d at 83.  Here, by contrast, the settlement agreement included a definite settlement amount and clearly specified the brief time—ten days—within which it would be paid.  *Cf. Oparah v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 8347 (JGK) (SN), 2015 WL 4240733, at *7 (S.D.N.Y. July 10, 2015) (finding that the agreement was not complex enough to require a formal writing where no payment plan was discussed, the proposed memorialization of the terms was short, and the agreement settled all claims).

Even if the Court were to find that this type of agreement is typically reduced to a formalized writing, the parties' agreement was not oral and was memorialized in the form of an email.  *See, e.g.*, *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621 (KMW) (AJP), 2005 WL 1377853, at *10 (S.D.N.Y. June 9, 2005) ("[E]ven if one were to find that this type of agreement should be in writing, it was—the parties were not dealing with an oral agreement but one written in an email from [the defendant] and accepted by an email from [the plaintiff].").  The Court concludes that the email exchange

13

is sufficient for the nature of this agreement and that the complexity of the agreement does not require a formalized writing.

*   *   *

Weighing all four *Winston* factors, the Court finds that the parties intended to be bound by the October 19–20 agreement via email exchange and that they entered into a settlement agreement that is enforceable as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, Spheyr's motion to enforce the settlement is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Docs. 51, 57, enter judgment in the amount of $150,000 in favor of Spheyr, and close the case.

It is SO ORDERED.

Dated:   June 20, 2024
         New York, New York

_____
     EDGARDO RAMOS, U.S.D.J.